# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Taxi Connection, and Robin K.
Gamradt, individually,

<table>
<tr><td>Plaintiffs,</td><td><strong>MEMORANDUM OPINION<br>AND ORDER</strong></td></tr>
<tr><td>v.</td><td>Civil No. 06-1830 ADM/AJB</td></tr>
</table>

Dakota, Minnesota & Eastern
Railroad, Corporation, a
Delaware Corporation,

        Defendant.

_____

Sonja Dunnwald Peterson, Esq., Dunnwald & Peterson, P.A., Minneapolis, MN, on behalf of
Plaintiffs.

Brian J. Donahoe, Esq., Cutler & Donahoe, LLP, Sioux Falls, SD, on behalf of Defendant.

_____

## I. INTRODUCTION

On August 9, 2006, oral argument before the undersigned United States District Judge

was heard on Defendant Dakota, Minnesota & Eastern Railroad, Corporation's ("DM&E" or

"Defendant") Motion to Dismiss [Docket No. 2].  In their Complaint [Docket No. 1], Plaintiffs

Taxi Connection and Robin K. Gamradt ("Gamradt") (collectively, "Plaintiffs") allege

(1) reprisal, business, and gender discrimination in violation of the Minnesota Human Rights Act

("MHRA"), Minn. Stat. §§ 363A.15 and .17, and (2) breach of contract and promissory estoppel.

For the reasons set forth herein, DM&E's Motion to Dismiss is granted.

## II. BACKGROUND[1]

Robin Gamradt is the sole owner of Taxi Connection, the only locally owned taxi service based in Waseca, Minnesota. Compl. ¶¶ 3-4. In December 2001, Plaintiffs and DM&E orally agreed for DM&E to primarily use Taxi Connection's taxi services within a twenty-five mile radius of the Waseca Depot if Taxi Connection matched the contract price of Renzenberger Inc., DM&E's regional taxi service based in Kansas. Id. ¶¶ 6-7. DM&E thereafter primarily used Taxi Connection's taxi services in Waseca until December 14, 2004. Id. ¶ 8.

In the summer of 2003, Dan Boyd ("Boyd"), a DM&E Crew Member, began referring to Michelle Ingram ("Ingram"), a Taxi Connection driver, as "Shithead" when she was providing him with taxi services from the Waseca Depot. Id. ¶ 10. Ingram reported Boyd's name-calling to Gamradt, who advised Ingram to report Boyd's behavior to Dave Dunn ("Dunn"), DM&E's Manager of Train Operations. Id. ¶ 12. After Ingram reported Boyd's name-calling to Dunn, Boyd temporarily stopped that behavior. Id. ¶ 13. However, when Dunn resigned from DM&E in October 2004, Boyd resumed calling Ingram "Shithead." Id. ¶ 14. Around the same time, Boyd was promoted to Acting Manager of Train Operations. Id. ¶ 15. Ingram again reported Boyd's name-calling to Gamradt, who suggested that Ingram ask Boyd directly to stop calling her names. Id. ¶ 17. Despite Ingram's requests, Boyd continued to refer to Ingram as "Shithead" and even directed his four-year-old son to call Ingram "Shithead" in public. Id. ¶¶ 18-21. Plaintiffs aver that Boyd never called male drivers names, only Ingram. Id. ¶ 11.

On December 3, 2004, Ingram was speaking with Douglas Fairbanks ("Fairbanks"),

---

[1] In considering a motion to dismiss, the pleadings are construed in the light most favorable to the nonmoving party, and the facts alleged in the complaint must be taken as true. Hamm v. Groose, 15 F.3d 110, 112 (8th Cir. 1994).

DM&E's Assistant Manager of Train Operations, at the Waseca Depot, when Boyd again referred to her as "Shithead."  Id. ¶ 24, Ex. A.  Ingram ignored Boyd, and asked Fairbanks if he would need another taxi driver that day.  Id. ¶ 24, Ex. A.  Boyd then stated, "We'll just call Renzenberger."  Id. ¶ 24, Ex. A.  Ingram responded, "Is that a threat?"  Id. ¶ 24, Ex. A.  Boyd did not respond to Ingram's question.  Id. ¶ 24, Ex. A.  Plaintiffs aver that Boyd had previously threatened Ingram that he would call Renzenberger and not give his business to Taxi Connection.  Id. ¶ 24, Ex. A.  On December 6, 2004, Dave Hinna ("Hinna"), a DM&E Crew Member, reported the exchange at the Waseca Depot between Ingram and Boyd to Gamradt.  Id. ¶ 25, Ex. A.  Hinna recommended that Gamradt report the situation to DM&E's Human Resources Department.  Id. ¶ 25, Ex. A.

On December 7, 2004, Gamradt faxed a letter to Tracy Lund ("Lund"), DM&E's Director of Human Resources, reporting Boyd's conduct.  Id. ¶¶ 26-27, Ex. A.  That same day, Clyde Mittleider, one of Boyd's supervisors at DM&E, called Gamradt to "angrily" tell her that she had handled the situation incorrectly and that she should have just talked to Boyd's immediate supervisor.  Id. ¶ 28.  Also on December 7, 2004, Lund contacted Gamradt to report that DM&E would investigate Gamradt's claims.  Id. ¶ 29.  Gamradt related that she was concerned that DM&E would retaliate against Plaintiffs for their complaint.  Id.  One week after DM&E received Gamradt's fax, DM&E terminated its oral contract with Taxi Connection.  Id. ¶ 33a.

In January 2005, DM&E's President and Chief Executive Officer Kevin V. Schieffer ("Schieffer") contacted Gamradt and told her there would be an investigation with a resolution to Gamradt's complaint within a couple of weeks.  Id. ¶ 30.  He also stated that he had a "low

tolerance for retaliation in business." Id.  Gamradt also spoke with Lund, who confirmed that two weeks was a reasonable amount of time to expect a resolution. Id. ¶ 31.  Plaintiffs aver that they postponed taking action against DM&E for its illegal conduct in reliance on the promises made by Schieffer and Lund. Id. ¶ 32.  Plaintiffs never heard from DM&E again regarding Gamradt's complaint, and Lund did not return Gamradt's many phone calls. Id. ¶ 33b.

On July 28, 2005, Gamradt sent Schieffer a letter, expressing her desire for Taxi Connection and DM&E to resume their business relationship. Id. ¶ 33d, Ex. B.  Gamradt also expressed her desire that the two companies "put the unfortunate 'rift' between our two employees behind us, especially in light of the fact that [Ingram] has been gainfully employed elsewhere for some time now." Id. Ex. B.  Edward Terbell ("Terbell"), DM&E's Director of Operations, contacted Gamradt to tell her that she had an "uphill battle" because DM&E signed with a new taxi company in May 2005, and he did not want to bring her to Sioux Falls to discuss re-engagement with high expectations. Id. ¶ 33e.  Plaintiffs aver that Gamradt continued to try to set up a meeting with DM&E for several months to no avail, and finally succeeded in arranging a meeting with Terbell for January 30, 2006. Id. ¶¶ 33f, g.

At the beginning of the meeting, Terbell stated that he was not there to discuss the past, and if that was what Gamradt was there to do, the meeting was over. Id. ¶ 33g.  Terbell further stated that Gamradt could present him with a proposal, and the best he could do was to give her one or two runs a month. Id. ¶ 33h.  Gamradt stated that DM&E employees had been told absolutely not to call Taxi Connection for taxi services. Id. ¶ 33i.  She also stated that DM&E employees sometimes had to wait for up to an hour for a cab from thirty miles away in Mankato to pick them up, and Taxi Connection could provide DM&E with much better service. Id.  Since

the January 30, 2006 meeting, DM&E has continued to refuse to do business with Taxi

Connection.  Id. ¶ 33j.  On May 17, 2006, Plaintiffs instituted this lawsuit.

### III. DISCUSSION

**A.  Motion to Dismiss Standard**

Rule 12 of the Federal Rules of Civil Procedure provides that a party may move to

dismiss a complaint for lack of subject matter jurisdiction or for failure to state a claim upon

which relief can be granted.  Fed. R. Civ. P. 12(b)(1), (6).  In considering a motion to dismiss,

the pleadings are construed in the light most favorable to the nonmoving party, and the facts

alleged in the complaint must be taken as true.  Hamm v. Groose, 15 F.3d 110, 112 (8th Cir.

1994); Ossman v. Diana Corp., 825 F. Supp. 870, 879-80 (D. Minn. 1993).  Any ambiguities

concerning the sufficiency of the claims must be resolved in favor of the nonmoving party.

Ossman, 825 F. Supp. at 880.  "A motion to dismiss should be granted as a practical matter . . .

only in the unusual case in which the plaintiff includes allegations that show on the face of the

complaint that there is some insuperable bar to relief."  Frey v. City of Herculaneum, 44 F.3d

667, 671 (8th Cir. 1995).

**B.  Plaintiffs' MHRA Claims**

Defendant argues that Plaintiffs' MHRA claims are barred by the one-year statute of

limitations because the last alleged instance of discrimination and the alleged retaliation

occurred in 2004, but this lawsuit was not commenced until May 2006.  Minn. Stat. § 363A.28,

subd. 3; see Henderson v. Ford Motor Co., 403 F.3d 1026, 1032 (8th Cir. 2005).  Plaintiffs

respond that the limitations period is tolled because Defendant's discriminatory acts are a

continuing violation.  Plaintiffs argue that they continually contacted Defendant during 2005 and

early 2006 to re-establish their business relationship but, in retaliation for Plaintiffs' complaints of discrimination, Defendant consistently refused to use Plaintiffs' taxi services.  As a result, Plaintiffs aver that Defendant retaliates against them each time it uses a taxi service other than Taxi Connection from the Waseca Depot.

Plaintiffs rely on a number of analogous cases to support their theory, including Kohn v. City of Minneapolis Fire Department, 583 N.W.2d 8 (Minn. Ct. App. 1998) and Roberts v. North American Rockwell Corporation, 650 F.2d 823 (6th Cir. 1981).  In Kohn, the Minnesota Court of Appeals determined that the Minneapolis Fire Department's ongoing failure to promote Brian Kohn off of an eligibility list created from a discriminatory examination resulted in a continuing violation, such that the last continuing violation occurred within the limitations period.  583 N.W.2d at 12.  In Roberts, the United States Court of Appeals for the Sixth Circuit held that North American Rockwell axle plant's policy against hiring women was an ongoing discriminatory policy such that the company was continually violating Title VII so long as its discriminatory policy remained in effect.  650 F.2d at 827.  As a result, plaintiff was not required to continually apply for the job only to be continually rejected, and plaintiff's claim was not barred by the statute of limitations.  Id.

A plaintiff can establish a continuing violation of the MHRA by demonstrating either: (1) a series of related acts, one or more of which fall within the limitations period, or (2) the maintenance of a discriminatory system both before and during the limitations period.  Smith v. Ashland, Inc., 250 F.3d 1167, 1172 (8th Cir. 2001).  "Under Minnesota law, each individual discriminatory act which is part of a continuing violation triggers anew the time period for reporting the entire pattern of discrimination, as long as at least one incident of discrimination

6

occurred within the limitations period." Id.  The Minnesota Supreme Court has placed the proper focus "upon the time of the *discriminatory acts*, not upon the time at which the *consequences* of the acts became most painful."  Sigurdson v. Isanti County, 448 N.W.2d 62, 67 (Minn. 1989) (emphasis in original).  In other words, "[t]he court must determine whether a present violation exists, rather than whether there are continuing effects from earlier employment decisions."  Kohn, 583 N.W.2d at 11.

As an initial matter, Plaintiffs' argument that DM&E's refusal to do business with them constitutes gender discrimination is not sustainable.  Gamradt and Taxi Connection can not assert a gender discrimination claim on Ingram's behalf.  Ingram is not a plaintiff in this lawsuit. Plaintiffs have submitted no facts to support that DM&E had an ongoing discriminatory policy against women, as there was in the Roberts case—indeed, the fact that DM&E orally contracted with Taxi Connection, a female-owned business, for approximately three years weighs heavily against such a finding.  Finally, no facts have been proffered to support Plaintiffs' allegation that DM&E refused to do business with Plaintiffs because Gamradt is a woman.

Taking all facts alleged in the Complaint as true, the relevant retaliatory act is DM&E's termination of its business relationship with Plaintiffs after Plaintiffs opposed DM&E employee Boyd's discriminatory treatment of its employee, Ingram.  However, Plaintiffs' inability to re-establish its business relationship with DM&E was a continuing *consequence* of DM&E's discriminatory retaliation, not a continuing *violation* of the MHRA.  DM&E's use of other taxi services is not a series of related discriminatory acts, like the Kohn case.  In Kohn, the court found a continuing violation every time the Minneapolis Fire Department promoted individuals from the discriminatory eligibility list.  583 N.W.2d at 12.  In this case, involving a business-to-

business relationship and not an employer-employee relationship, the alleged retaliation was complete at the time that DM&E terminated its oral contract with Taxi Connection. DM&E's use of other taxi companies after that time was not continued retaliation, but rather the effects of its discrete business decision. As a result, Plaintiffs did not bring their claims within the limitations period, and their MHRA claims are barred by the one-year statute of limitations.

**C.      Plaintiffs' Contract Claims**

Plaintiffs argue that the parties established a contract in January 2005 when Schieffer and Lund promised to conduct an investigation into DM&E's recision of its business relationship with the Plaintiffs, not to tolerate retaliation, and to resolve the dispute. Plaintiffs aver that in exchange for DM&E's promise, they delayed prosecution of their discrimination claims. Plaintiffs argue that Defendant's failure to do what it promised constitutes a breach of contract, or alternatively, Defendant should be promissorily estopped from reneging on its promises to Plaintiffs.

The elements for formation of contract include offer, acceptance, and consideration. Edwards v. County of Hennepin, 397 N.W.2d 584, 586 (Minn. Ct. App. 1986). The offer must be definite in form and communicated to the offeree. Id. In this case, Plaintiffs' allegations do not establish formation of a contract. While Defendant did tell Plaintiffs that it would investigate and resolve Gamradt's complaint, there is no indication that Defendant's statement was a definite offer for the Plaintiffs to accept.

In the alternative, Plaintiffs argue promissory estoppel. The elements of promissory estoppel include: (1) a promise, (2) which the promisor should reasonably expect to induce action or forbearance on the part of the promisee, (3) which does induce such action or

forbearance (detrimental reliance), and (4) injustice can be avoided only by enforcement of the promise.  <u>Grouse v. Group Health Plan, Inc.</u>, 306 N.W.2d 114, 116 (Minn. 1981).  Plaintiffs' allegations have also failed to establish a claim for promissory estoppel.  While Plaintiffs' facts may support the making of a promise, and that Plaintiffs detrimentally relied on what they believed to be a promise, there are no facts to support that DM&E should have reasonably expected Plaintiffs to forbear from bringing suit.  As a result, Plaintiffs' contract claims must fail.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that DM&E's Motion to Dismiss [Docket No. 2] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  September 5, 2006.